UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
--------------------------------------------------x

UNITED STATES OF AMERICA,

                 Plaintiff,

  - against -

NEDJET YETIM,
RACHELANN YETIM,
BLACK REALTY, INC.,
HEMPSTEAD GASOLINE STATION, INC.,
FAST GASOLINE STATION, INC.
ELMONT GASOLINE CO. INC.,
102 ELMONT REALTY CORP.,
TAG GASOLINE, INC.,
TARGET PETROLEUM, INC.,
LIBERTY PETROLEUM – RGV PETROLEUM, INC.,
ASLI & GIZEM REALTY CORP.,
NGRV REALTY CO., INC.,
VENUS BUKEY REALTY, INC.,
S&B PETROLEUM, INC.,
GIZEM REALTY CORP.,
T-MAXX @ PETRO GAS, INC., and
PDE ISLAND PARK, INC.,

                 Defendants.
--------------------------------------------------x

**F I L E D**
IN CLERK'S OFFICE
U.S. DISTRICT COURT E.D.N.Y.

★   FEB 07 2014   ★

Civil Action
No. CV LONG-ISLAND OFFICE

(_____, J.)
(_____, M.J.)

**CV 14 0847**

**BIANCO, J.**

**WALL, M.**

## COMPLAINT

Plaintiff UNITED STATES OF AMERICA, by its attorney LORETTA E. LYNCH,

United States Attorney for the Eastern District of New York, KENNETH M. ABELL, Assistant

United States Attorney, of counsel, by the authority of the Attorney General and on behalf of the

United States Environmental Protection Agency ("EPA"), for its complaint against defendants

herein alleges as follows:

1

## NATURE OF THE ACTION

1.     This is a civil action brought at the request of the Regional Administrator of EPA Region 2 pursuant to Section 9006 of the Solid Waste Disposal Act, as amended by various laws, including the Resource Conservation and Recovery Act (hereinafter referred to as the "Act" or "RCRA"), 42 U.S.C. § 6991e et seq., for civil penalties and injunctive relief for defendants' violations of RCRA requirements regarding underground storage tanks ("USTs") at four automobile fueling station facilities in Nassau and Suffolk County, New York.  The facilities are located at: (1) 653 Hempstead Turnpike, Elmont, New York; (2) 1278 Hempstead Turnpike, Elmont, New York; (3) 725 Wyandanch Avenue, North Babylon, New York; and (4) 4305 Austin Boulevard, Island Park, New York.

2.     The defendants have failed to meet numerous requirements mandated by Subtitle I of RCRA, including: (1) failure to provide cathodic protection for existing metal piping, in violation of 40 C.F.R. §§ 280.20(b)(2) and 280.21(c); (2) failure to provide adequate release detection methods for tanks that routinely carry product, in violation of 40 C.F.R. § 280.41(a); (3) failure to provide methods of release detection for pressurized piping systems, in violation of 40 C.F.R. § 280.41(b)(1); (4) failure to annually test automatic line leak detectors for underground piping, in violation of 40 C.F.R. §§ 280.44(a); (5) failure to conduct testing of a cathodic protection system every three years, in violation of 40 C.F.R. § 280.31(b)(1); (6) failure to maintain records of release detection, in violation of 40 C.F.R. §§ 280.34 and 280.45; (7) failure to properly cap and secure a temporarily closed UST, in violation of 40 C.F.R. § 280.70(b)(2); (8) failure to install adequate overfill protection in a new tank, in violation of 40 C.F.R. § 280.20(c)(1)(ii); (9) failure to provide overfill prevention system for an existing tank, in

violation of 40 C.F.R. § 280.21(d); and (10) failure to respond to requests for information duly issued by EPA pursuant to EPA's information-gathering authority under Section 9005 of the Act, 42 U.S.C. § 6991d, and 40 C.F.R. § 280.34.

3.      The defendants, who owned and/or operated USTs at one or more of the four automobile fueling stations, are:  Nejdet Yetim, Rachelann Yetim, Black Realty, Inc. ("Black Realty"), Hempstead Gasoline Station, Inc. ("Hempstead Gasoline"), Fast Gasoline Station, Inc. ("Fast Gasoline"), Elmont Gasoline Corp. ("Elmont Gasoline"), 102 Elmont Realty Corp. ("102 Elmont"), TAG Gasoline, Inc. ("TAG Gasoline"), Target Petroleum, Inc. ("Target Petroleum"), Liberty Petroleum – RGV Petroleum, Inc. ("Liberty – RGV"), ASLI & Gizem Realty Corp. ("ASLI Realty"), NGRV Realty Co., Inc. ("NGRV Realty"), Venus Bukey Realty, Inc. ("Venus Bukey"), S&B Petroleum, Inc. ("S&B"),  Gizem Realty Corp. ("Gizem Realty"), PDE Island Park, Inc., ("PDE"), and T-Maxx @ Petro Gas, Inc. ("T-Maxx") (collectively "defendants").

4.      Defendants Nedjet Yetim and Rachelann Yetim are owners and officers of certain of the corporate defendants. The corporate entities are related in that, among other things, they have overlapping officers and shareholders, and at times share common corporate addresses and telephone numbers (in some cases, the same as those for the individual defendants).  Defendant Nedjet Yetim has, at various times, been actively involved with every facility, and many of the corporate entities, named in this action.  He uses his home address as the primary address for at least one of the corporate defendants.

## JURISDICTION AND VENUE

5.      This Court has jurisdiction over the subject matter of this action pursuant to section 9006(a)(1) of RCRA, 42 U.S.C. § 6991e(a)(1), and 28 U.S.C. §§ 1331, 1345, and 1355.

Venue is proper in this district pursuant to Section 9006(a) of RCRA, 42 U.S.C. § 6991e(a), and 28 U.S.C. §§ 1391 and 1395 because the violations occurred within this district and/or the defendants reside in this district.

## DEFENDANTS

6.      For ease of reference, the defendants associated with the 653 Hempstead Turnpike Facility are: Nedjet Yetim, Rachelann Yetim, Black Realty, TAG Gasoline, Hempstead Gasoline, Elmont Gasoline and 102 Elmont (collectively, the "653 Defendants").   The defendants associated with the 1278 Hempstead Turnpike facility are: Nedjet Yetim, Target Petroleum, Liberty – RGV, T-Maxx and ASLI Realty (collectively, the "1278 Defendants"). The defendants associated with the 725 Wyandanch facility are: Nedjet Yetim, Rachelann Yetim, NGRV Realty, Venus Bukey, S&B and Gizem Realty (collectively, the "725 Defendants").   The defendants associated with the 4305 Austin Boulevard facility are: Fast Gasoline, PDE, T-Maxx and Venus Bukey (collectively, the "4305 Defendants").

Nedjet Yetim

7.      Nedjet Yetim is an individual residing in the Eastern District of New York.

8.      On information and belief, Nedjet Yetim is currently the principal of: (a) ASLI Realty (owner of the USTs located at 1278 Hempstead Turnpike); (b) Hempstead Gasoline (former operator of the USTs located at 653 Hempstead Turnpike); and (c) Gizem Realty (former owner of the USTs located at 725 Wyandanch).

9.      Nedjet Yetim is also the owner of Target Petroleum (former operator of the USTs at 1278 Hempstead Turnpike) and the President of Venus Bukey (owner and previous operator of the USTs at 4305 Austin Boulevard).

4

10.     In or about October 2009, the Nassau County District Attorney's Office charged Nedjet Yetim with Endangering Public Health, Safety or the Environment in the Third Degree and Knowingly Violating a Final Administrative Order, both felonies.

11.     The Nassau County District Attorney alleged that Nedjet Yetim had ignored orders from the New York State Department of Environmental Conservation ("NYSDEC") to repair a damaged UST at the 1278 Hempstead facility, which was found to be leaking petroleum into the soil and groundwater.

12.     According to the Nassau County District Attorney's Office, between December 2005 and April 2006 alone, more than 200 gallons of gasoline may have leaked into the soil and groundwater around the tank.

13.     A search warrant executed by the Nassau County District Attorney's Office on August 20, 2009 confirmed the presence of petroleum in soil and groundwater samples taken from around the UST.

14.     The tank was taken out of operation and the criminal case against Nedjet Yetim is pending.

15.     On information and belief, at relevant times herein, Nedjet Yetim managed, directed or conducted decisions about environmental compliance at the facilities at issue in this case.

16.     Nedjet Yetim also knew about – and was in a position to prevent – the repeated violations at the facilities, but he failed to do so.

17.     For example, with respect to the 1278 Hempstead Turnpike facility, Nedjet Yetim has been the primary point of contact – for both NYSDEC and EPA – regarding day-to-day

5

operations at the facility. Nedjet Yetim has also been the primary point of contact regarding the many environmental concerns expressed by the government and has, at times, provided responses – albeit incomplete and inaccurate – to government information requests regarding operations at the facility.

18.    On-site representatives at the July 2011 inspection of the 653 Hempstead Turnpike facility advised an EPA inspector that the operator of the facility continued to be Nedjet Yetim, even though Nedjet had advised EPA in a letter dated July 6, 2010 that he had transferred the station to his daughter, defendant Rachelann Yetim.

19.    On-site representatives at the October 2009 inspection of the 4305 Austin Boulevard facility advised the EPA inspector that Nedjet Yetim was the owner of the facility and was the point person for issues relating to environmental concerns.

20.    Until at least July 2009, Nedjet Yetim, through the company Gizem Realty was also the long-standing owner of the 725 Wyandanch facility.

21.    Nedjet Yetim has also, at times, personally corresponded with EPA regarding its inspections and requests for information relating to facilities identified in this Complaint.

22.    Moreover, on information and belief, due to previous petroleum releases at some of the facilities at issue, Nedjet Yetim cannot obtain insurance for new USTs. He has also advised EPA that due to outstanding debts, he has poor credit.

23.    For these reasons, possibly among others, Nedjet advised the EPA inspector that he has purportedly transferred control of certain of the corporate entities to his daughter, Rachelann Yetim, and his wife, Gulcin Yetim.

24.    Nedjet Yetim – through his involvement with all of the other defendants in this

6

case, as well as his involvement with each of the four facilities at issue in the case – is the chief perpetrator of the pervasive wrongdoing alleged in this Complaint.

Rachelann Yetim

25.     Rachelann (a/k/a Rachel) Yetim is an individual residing in the Eastern District of New York.

26.     Rachelann Yetim is the principal of: (a) Black Realty (owner of the USTs at the 653 Hempstead Turnpike facility); (b) Fast Gasoline (operator of the USTs at the 4305 facility), and (c) NGRV Realty (owner and former operator of the USTs at the 725 Wyandanch facility).

27.     On information and belief, at relevant times herein, Rachelann Yetim managed, directed or conducted decisions about environmental compliance issues at one, and possibly more, of the four facilities at issue in this case.

28.     Rachelann Yetim also knew about – and was in a position to prevent – the repeated violations at certain of the facilities, but she failed to do so.

29.     For example, on-site representatives at the 653 Hempstead Turnpike facility have advised EPA inspectors that they report directly to Rachelann Yetim and that she would have all test results relating to environmental issues.

30.     In addition, during the January 2013 inspection of the 4305 Austin Boulevard facility, on-site representatives advised an EPA inspector that Rachelann is the owner of that facility.

31.     Rachelann Yetim has also, at times, personally corresponded with EPA regarding its inspections and requests for information relating to facilities identified in this Complaint.

7

Black Realty, Inc.

32.     Black Realty is a corporation organized under the laws of the State of New York, with its corporate address at 653 Hempstead Turnpike, Elmont, New York, 11003.

33.     Black Realty has been the owner of USTs at the 653 Hempstead Turnpike facility since November 2009.  On information and belief, Black Realty was also the operator of the USTs at the same facility during the relevant time period.

34.     Defendant Rachelann Yetim is the principal of Black Realty.

Hempstead Gasoline Station, Inc.

35.     Hempstead Gasoline Station, Inc. is a corporation organized under the laws of the State of New York.  The process address Hempstead Gasoline has on file with the New York Department of State is 653 Hempstead Turnpike, Elmont, New York 11003.

36.     From at least January 25, 2010 to January 25, 2011, Hempstead Gasoline was the operator of the USTs at the 653 Hempstead Turnpike facility.

Fast Gasoline Station, Inc.

37.     Fast Gasoline Station, Inc. is a corporation organized under the laws of the State of New York.  The process address Fast Gasoline has on file with the New York Department of State is 4305 Austin Boulevard, Island Park, New York 11558.

38.     Fast Gasoline is the current operator of the USTs at the 4305 Austin Boulevard facility.

Elmont Gasoline Co., Inc.

39.     Elmont Gasoline is an inactive corporation organized under the laws of the State of New York.  The process address Elmont Gasoline has on file with the New York Department

of State is 653 Hempstead Turnpike, Elmont, New York, 11703.

40.     From January 2008 until in or about November 2009, Elmont Gasoline was the operator of the USTs at the 653 Hempstead Turnpike facility.

41.     On information and belief, defendant Nedjet Yetim is the principal of Elmont Gasoline.

102 Elmont Realty Corp.

42.     102 Elmont Realty Corp. is an inactive corporation organized under the laws of the State of New York. The process address 102 Elmont has on file with the New York Department of State is 653 Hempstead Turnpike, Elmont, New York, 11703.

43.     Until at least the end of 2009, 102 Elmont was the owner of the USTs at the 653 Hempstead Turnpike facility.

44.     On information and belief, defendant Nedjet Yetim is the principal of 102 Elmont.

TAG Gasoline

45.     TAG Gasoline is a corporation organized under the laws of the State of New York. The process address TAG has on file with the New York Department of State is 1278 Hempstead Turnpike, Elmont, New York, 11003.

46.     TAG Gasoline is the current operator of the USTs at the 653 Hempstead Turnpike facility.

Target Petroleum, Inc.

47.     Target Petroleum is an inactive corporation organized under the laws of the State of New York, with its corporate address at 1741 Montauk Highway, Bellport, New York, 11722.

48.     Until in or about September 2012, Target Petroleum was the operator of the USTs

9

at the 1278 Hempstead Turnpike facility.

49.     On information and belief, defendant Nedjet Yetim is the owner of Target Petroleum and his wife, Gulcin Yetim, is the principal of Target Petroleum.

Liberty Petroleum - RGV Petroleum, Inc.

50.     Liberty Petroleum – RGV Petroleum, Inc. is listed as the current operator of the USTs at 1278 Hempstead Turnpike, Elmont, New York on the official UST registration statement filed with the Nassau County Office of Fire Marshal.

51.     There is no record of a corporation with the entity name "Liberty Petroleum – RGV Petroleum, Inc." in the New York Department of State Corporation and Business Entity Database, though it may be incorporated in another state.

ASLI & Gizem Realty Corp.

52.     ASLI & Gizem Realty Corp. is an inactive corporation organized under the laws of the State of New York.  The process address ASLI has on file with the New York Department of State is 350 Commack Road, Commack, New York, 11725.

53.     ASLI & Gizem Realty is the current owner of the USTs at the 1278 Hempstead Turnpike facility.

NGRV Realty Co., Inc.

54.     NGRV Realty is a corporation organized under the laws of the State of New York, with its corporate address at 725 Wyandanch Avenue, North Babylon, New York, 11703.

55.     From at least July 9, 2009 until in or about 2011, NGRV Realty was the owner of the USTs at the 725 Wyandanch facility.

56.     Defendant Rachelann Yetim is the principal of NGRV Realty.

Venus Bukey Realty, Inc.

57.     Venus Bukey is an inactive corporation organized under the laws of the State of New York.   The process address Venus Bukey has on file with the New York Department of State is 725 Wyandanch Avenue, North Babylon, New York, 11703.

58.     Currently, Venus Bukey uses the address 2 Patricia Lane, Patchogue, New York 11772, which is the home address of defendant Nedjet Yetim.

59.     Since at least August 31, 2009, Venus Bukey has been the owner of the USTs at the 4305 Austin Boulevard facility and was, at least from March 31, 2009 until September 26, 2011, also the operator of the USTs at that facility.

S&B Petroleum, Inc.

60.     S&B is a corporation organized under the laws of the State of New York, with its corporate address at 725 Wyandanch Avenue, North Babylon, New York, 11703.

61.     S&B was the operator of the USTs at the 725 Wyandanch facility from a point pre-dating October 21, 2009 until May 30, 2013.

Gizem Realty Corp.

62.     Gizem Realty is an inactive corporation organized under the laws of the State of New York, with its corporate address at 725 Wyandanch Avenue, North Babylon, New York, 11703.

63.     Until on or about July 2009, Gizem Realty was the owner of the USTs at the 725 Wyandanch facility.

64.     Defendant Nedjet Yetim is the principal of Gizem Realty.

T-Maxx @ Petro Gas, Inc.

65.     T-Maxx is a corporation organized under the laws of the State of New York. The process address T-Maxx has on file with the New York Department of State is 1278 Hempstead Turnpike, Elmont, New York, 11003.

66.     T-Maxx was the operator of the USTs located at the 1278 Hempstead Turnpike and 4305 Austin Boulevard facilities in or about 2011.

PDE Island Park, Inc.

67.     PDE Island Park is a corporation organized under the laws of the State of New York. The process address PDE Island Park has on file with the New York Department of State is 6080 Jericho Turnpike, Suite 300, Commack, New York, 11725.

68.     PDE Island Park was the operator of the USTs at the 4305 Austin Boulevard facility from late 2011 until 2012.

## RCRA AND THE APPLICABLE REGULATIONS

69.     RCRA established a comprehensive federal regulatory program for the management of hazardous wastes. 42 U.S.C. § 6901 et seq.

70.     On November 8, 1984, as part of the Hazardous and Solid Waste Amendments ("HSWA") of 1984 to RCRA, Congress created Subtitle I of RCRA, Regulation of Underground Storage Tanks, 42 U.S.C. § 6991 et seq. RCRA Subtitle I was created in response to the growing number of groundwater contamination incidents caused by regulated substances leaking from USTs.

71.     Section 9003(a) of RCRA, 42 U.S.C. § 6991b(a), directs the Administrator of EPA to promulgate release detection, prevention, and corrective action regulations applicable to

12

all owners and operators of underground storage tanks, as may be necessary to protect human health and the environment.

72.  "Owner" is defined in section 9001(3) of RCRA, 42 U.S.C. § 6991(3) as,

(A)  in the case of an underground storage tank in use on November 8, 1984, or brought into use after that date, any person who owns an underground storage tank used for the storage, use, or dispensing of regulated substances, and

(B)  in the case of any underground storage tank in use before November 8, 1984, but no longer in use on November 8, 1984, any person who owned such tank immediately before the discontinuation of its use.

73.  "Operator" is defined in section 9001(4) of RCRA, 42 U.S.C. § 6991(4), as "any person in control of, or having responsibility for, the daily operation of the underground storage tank."

74.  The definition of "person," pursuant to section 1004(15) of RCRA, 42 U.S.C. § 6903(15), includes, but is not limited to, individuals, corporations, and partnerships.

75.  "Underground Storage Tank" is defined in section 9001(l) of RCRA, 42 U.S.C. § 6991(l), in part, as, any one or combination of tanks (including underground pipes connected thereto) which is used to contain an accumulation of regulated substances.

76.  "Underground Storage Tank System" is defined in 40 C.F.R. Part 280, Subpart A, § 280.12 as an underground storage tank, connected underground piping, underground ancillary equipment, and containment system, if any.

77.  "Regulated Substance" is defined in section 9001(2)(B) of RCRA, 42 U.S.C. § 6991(2)(B), in part, as "petroleum."  Petroleum includes gasoline, diesel fuel, and used motor oil.

78.  The regulations promulgated by the Administrator of the EPA pursuant to Subtitle

13

I of RCRA are codified at 40 C.F.R. Parts 280 and 281.

79.    Pursuant to 40 C.F.R. Part 280, Subpart A, § 280.10(a), "[t]he requirements of this part apply to all owners and operators of an UST system."

80.    The terms "Underground Storage Tank," "Regulated Substance," "Owner" and "Person" are defined in 40 C.F.R. Part 280, Subpart A, § 280.12 in a manner consistent with the statutory definitions.

81.    Section 9003(a) of RCRA, 42 U.S.C. § 6991b(a) requires the EPA Administrator to promulgate release detection, prevention, and corrective action regulations applicable to owners and operators of USTs, as may be necessary to protect human health and the environment.

82.    The regulations setting forth the requirements governing the operation and maintenance of corrosion protection systems are codified at 40 C.F.R. Part 280, Subpart C, § 280.31.  These regulations require, among other things: (a) that all cathodic protection systems be operated and maintained to continuously provide cathodic protection to the metal components of that portion of the tank and piping that routinely contain regulated substances and are in contact with the ground, (b) cathodic protection systems must be inspected for proper operation by a qualified cathodic protection tester within six months of installation and at least every three years thereafter and (c) for UST systems using cathodic protection, records of the operation of the cathodic protection must be maintained (in accordance with 40 C.F.R. § 280.34) to demonstrate compliance with the performance standards in this section.

83.    The regulations setting forth the requirements governing new UST systems and the upgrade of existing UST systems are codified at 40 C.F.R. Part 280, Subpart B, §§ 280.20

and 280.21, respectively. These regulations require, among other things: (a) cathodic protection for metal piping in UST systems, and (b) installation of adequate overfill prevention systems for new and existing USTs.

84.    Section 9003(c)(1) of RCRA, 42 U.S.C. § 6991b(c)(1), requires the EPA Administrator to promulgate regulations applicable to owners and operators of USTs, including requirements for maintaining release detection systems, inventory control systems together with tank testing, or a comparable system or method to identify releases.

85.    The regulations setting forth the requirements for release detection are codified at 40 C.F.R. Part 280, Subpart D, §§ 280.40-280.45. These regulations require, among other things: (a) adequate release detection methods capable of detecting a release from an UST that routinely contains product, (b) annual line tightness tests or monthly monitoring of pressurized piping of UST systems, and (c) maintenance of records of annual tests of automatic line leak detector operation for underground piping.

86.    Section 9003(c)(2) of RCRA, 42 U.S.C. § 6991b(c)(2), requires the EPA Administrator to promulgate regulations applicable to owners and operators of USTs, including requirements for maintaining records of any monitoring or testing of the UST system.

87.    The regulations setting forth the general record keeping requirements and the specific record keeping requirements relating to cathodic protection, release detection, and UST closure are codified at 40 C.F.R. Part 280, Subparts C, D and G, §§ 280.34, 280.45, and 280.74, respectively.

88.    Section 9003(c)(5) of RCRA, 42 U.S.C. § 6991b(c)(5), requires the EPA Administrator to promulgate regulations applicable to owners and operators of USTs, including

requirements for the closure of tanks to prevent future releases of regulated substances into the environment.

89.    The regulations setting forth the requirements for temporary closure of an underground storage tank are codified at 40 C.F.R. Part 280, Subpart G, §§ 280.70.

90.    Section 9005(a) of RCRA, 42 U.S.C. § 6991d(a), and 40 C.F.R. § 280.34 require any owner or operator of an UST to submit to EPA information relating to USTs, their associated equipment and contents, and records of the conduct of monitoring and testing.

91.    Section 9006 of RCRA, 42 U.S.C. § 6991e authorizes the EPA Administrator to commence a civil action for appropriate relief, including a permanent or temporary injunction, when a person has violated or is in violation of Subtitle I of RCRA, 42 U.S.C. § 6991 et seq., or its implementing regulations.

92.    Pursuant to Section 9006(d) of RCRA, 42 U.S.C. § 699le(d),

(1) Any owner who knowingly fails to notify or submits false information pursuant to section 6991a(a) of this title shall be subject to a civil penalty not to exceed $10,000 for each tank for which notification is not given or false information is submitted.

(2) Any owner or operator of an underground storage tank who fails to comply with (A) any requirement or standard promulgated by the Administrator under section 6991b . . . shall be subject to a civil penalty not to exceed $10,000 for each tank for each day of violation.

93.    Under the Federal Civil Penalty Inflation Adjustment Act of 1990, as amended by the Debt Improvement Act of 1996, EPA is required to adjust its penalties for inflation on a periodic basis. EPA has issued the Civil Monetary Penalty Inflation Adjustment Rule, 40 C.F.R. Part 19, which provides that violations which occur on or after January 12, 2009 are subject to a new statutory maximum penalty of $16,000 per tank for each day of violation.

## DEFENDANTS' STATUS UNDER RCRA

94.     Each defendant identified in paragraphs 6 through 68 is a "person" within the meaning of Section 1004(15) of RCRA, 42 U.S.C. § 6903(15) and 40 C.F.R. § 280.12.

95.     Each defendant identified in paragraphs 6 through 68 is an "owner" and/or "operator" of an underground storage tank within the meaning of sections 9001(3) and (4) of RCRA, 42 U.S.C. §§ 6991(3) and(4), and 40 C.F.R. § 280.12.

## DEFENDANTS' FACILITIES

96.     All four of the facilities at issue are located within the boundaries of a federally designated Sole Source Aquifer, which among other criteria, is an aquifer which supplies at least fifty percent (50%) of the drinking water consumed in the area within the Sole Source Aquifer boundaries.  The Sole Source Aquifer designation is a tool to protect drinking water supplies in areas with few or no alternative sources to the groundwater resource, and where if contamination occurred, using an alternative source would be extremely expensive.

653 Hempstead Turnpike, Elmont, New York

97.     The facility at 653 Hempstead Turnpike, Elmont, New York, is an automobile fueling station and an automotive maintenance center.

98.     As of January 31, 2013, this facility had one 6,000-gallon UST and one 8,000-gallon UST.  They are both constructed of fiberglass reinforced plastic ("FRP") and were installed in 1985, and are therefore an "existing tank system" as defined by 40 C.F.R. § 280.12.  Both USTs store petroleum, a regulated substance.

99.     Since 2001, there have been at least two petroleum releases from the USTs at this facility.

17

100.    During EPA's initial inspection of this facility, on October 21, 2009, EPA observed several violations.

101.    Among other things, the inspector observed that the pressurized pumps for two of the tanks, which transfer product from the UST to the piping, had metallic components that were in contact with the soil.  Because the piping was in contact with the ground, pursuant to 40 C.F.R. § 280.21(c), it was required to be upgraded with cathodic protection to prevent corrosion. The inspector did not, however, observe any cathodic protection for the piping at the facility.

102.    The inspector also determined that no valid method of release detection was being performed for the USTs at the facility.  The on-site representative told the inspector that the facility relied on groundwater monitoring for release detection.  Upon information and belief, the water table at this facility is more than twenty feet below the ground surface.  Accordingly, pursuant to 40 C.F.R. § 280.43(g), groundwater monitoring is not a permissible method of release detection.  Moreover, because this facility has a history of groundwater contamination from a previous spill, groundwater monitoring is not an effective method of detecting future releases.  In addition, groundwater monitoring wells must be "clearly marked" in accordance with the requirements of 40 C.F.R. § 280.43(f).  The one well that EPA observed during its inspection was not marked consistent with the applicable requirements.

103.    There was an automatic line leak detector ("ALLD") at the facility.  There was no evidence, however, that ALLD testing required by 40 C.F.R. § 280.44(a) was performed, as the facility failed to provide ALLD testing records in response to the EPA inspector's request.

104.    Two out-of-service USTs at the facility had not been properly closed, as required by 40 C.F.R. § 280.70(b).  This was evidenced by fill pipes for the two out-of-service USTs that

18

were not capped or secured in any way. One of the USTs was later placed back into service and the other was eventually closed permanently.

105.    EPA inspected this facility for a second time on July 27, 2011.

106.    During this inspection, EPA again observed several violations. EPA observed that the pressurized sump pumps for the two remaining lines were still situated in soil-filled holes and appeared corroded. The inspector performed a magnet test, which verified that the piping entering the soil was metal. There was, however, still no upgrading of cathodic protection for the metal piping, in violation of 40 C.F.R. § 280.21(c).

107.    During the July 2011 inspection, the facility was unable to provide any evidence of release detection performance for the piping or test results for the ALLDs.

108.    There was also no record of release detection performance for the tanks during the July 2011 inspection of the facility.

109.    The facility did not have any other valid means of release detection for the tanks or the piping. For this reason, the EPA inspector requested records of tank tightness tests and annual line tightness tests, and the facility was unable to provide any such records. Tightness tests place the tank or line under pressure with air to see if there is a loss of pressure anywhere in the system – the most likely way to detect a breach in the system and, thus, potential for a leak. Pursuant to 40 C.F.R. § 280.41(a), for tanks under ten years old, facilities can use a combination of inventory control and tank tightness testing to perform release detection. Pursuant to 40 C.F.R. § 280.41(b), for lines, annual tightness tests can be used as an alternative to monitoring the lines for releases each month.

110.    During EPA's most recent inspection of this facility, on January 31, 2013, the

19

USTs remained in non-compliance with 40 C.F.R. Part 280 requirements.

111.    The pumps were still situated in soil and were badly corroded.  The facility still had metallic underground lines from the pumps but there was still no cathodic protection.

112.    EPA requested records of release detection/line tightness tests for the lines and of ALLD testing, and the facility was unable to provide any such records.

113.    On June 18, 2013, the EPA received a purported response to one of its Information Request Letters ("IRL") from "Boss Auto," another entity linked to the Yetims.  The purported response provided in part a contractor's claim that the submersible pumps at 653 Hempstead Turnpike did not require corrosion protection because they were protected using "dielectric" or "hydro electric" tape.  EPA does not, however, recognize the use of any form of tape as a method of corrosion protection as required by 40 C.F.R. § 280.21(c).  Furthermore, the contractor made a statement that the product lines were made of fiberglass and did not require corrosion protection.  This contention is contradicted by the personal observations of EPA's inspectors.  The response also provided a passing ALLD test for the two pressurized lines dated May 15, 2015.

1278 Hempstead Turnpike, Elmont, New York

114.    The facility located at 1278 Hempstead Turnpike, Elmont, New York is an automobile fueling station and an automotive maintenance center.

115.    Prior to the summer of 2012, this facility had three 4,000-gallon USTs.  All of the USTs were constructed of FRP and were installed in 1983 and are therefore "existing tank system[s]" as defined by 40 C.F.R § 280.12.  All of the USTs store or stored petroleum, a regulated substance.

116.    One of the tanks was permanently closed prior to January 31, 2013.

117.    As of January 31, 2013, two 4,000-gallon USTs remained in operation at the facility at 1278 Hempstead Turnpike.

118.    Since 1999, there have been at least four petroleum releases from the USTs at this facility. This includes the release of more than 200 gallons of gasoline into soil and groundwater between December 2005 and April 2006, which is the basis for the pending criminal action against Nedjet Yetim as described above.

119.    EPA first inspected this facility on July 8, 2009 and observed several violations.

120.    During that inspection, the inspector observed FRP piping connected to some metallic components, some of which were corroded. This indicated that the metallic piping components had not been upgraded with adequate cathodic protection, as required by 40 C.F.R. § 280.21(c)

121.    At the July 2009 inspection, the inspector also noted that the regular fill pipe in one of the USTs had no overfill protection, in violation of 40 C.F.R. § 280.21(d).

122.    In addition, at the July 2009 inspection, the facility representative told EPA that the release detection method for the USTs was groundwater monitoring. Upon information and belief, the water table at this facility is more than twenty feet below the ground surface. Accordingly, pursuant to 40 C.F.R. § 280.43(g), groundwater monitoring is not a permissible method of release detection. Moreover, because this facility has a history of groundwater contamination from a previous spill, groundwater monitoring is not an effective method of detecting future releases. In all events, the groundwater monitoring could not be verified because records were not made available to the inspector and the wells were not clearly marked

21

as required by 40 C.F.R. 280.43(f)(8).

123.    EPA inspected this facility for a second time on July 27, 2011.

124.    During the re-inspection, the inspector observed that metallic piping connected to one of the dispensers did not have cathodic protection.

125.    There was also no evidence of release detection for the tanks at the July 2011 inspection.

126.    In December 2011, there was a significant petroleum release from one of the USTs at this facility.  Despite the risks posed by the release, Nedjet Yetim ignored several requests by NYSDEC to address the release by, among other things, repairing the tank or taking it out of service.

127.    Consequently, in April 2012, NYSDEC issued a delivery prohibition – a formal notice placed on each UST which prohibits delivery of petroleum to the facility – when it was discovered that defendant Nedjet Yetim continued to operate the tanks without addressing the December 2011 petroleum release, such as by emptying and repairing the tanks.

128.    As part of a subsequent corrective action plan for the release, defendants closed one of the USTs under the oversight of NYSDEC.

129.    During EPA's most recent inspection, on January 31, 2013, the inspector noted that a new automatic tank gauge system for electronic release detection had been installed for the two remaining USTs.

130.    Nevertheless, the facility continues to be in violation of applicable federal regulations because there is still a metallic underground line between the two dispenser islands that does not have cathodic protection.

131.    On June 18, 2013, the EPA received a purported response to one of its Information Request Letters ("IRL") from "Boss Auto," another entity linked to the Yetims. The purported response provided in part a contractor's claim that all product lines at 1278 Hempstead Turnpike were made of fiberglass and did not require corrosion protection. This contention is contradicted by the personal observations of EPA's inspectors

725 Wyandanch Avenue, West Babylon, New York

132.    The facility at 725 Wyandanch Avenue, West Babylon, New York is an automobile fueling station.

133.    Prior to February 2011, this facility had an 8,000-gallon UST and a 6,000-gallon UST. Both tanks are constructed of FRP and were installed in 1999 and are therefore a "new tank systems" as defined by § 280.12. Both USTs stored petroleum, a regulated substance.

134.    As of January 31, 2013, this facility had two newly-installed 10,000-gallon USTs, which replaced the previous tanks that had been removed in February 2011.   Both new tanks were fiberglass and were installed in 2011 and both are therefore "new tank systems" as defined by § 280.12. Both USTs store petroleum, a regulated substance.

135.    Since 2001, there have been at least two petroleum releases from USTs at this facility.

136.    During EPA's initial inspection of this facility, on October 21, 2009, the EPA inspector observed several violations.

137.    Among other things, the EPA inspector noted that the piping in the super gasoline sump pit was connected to a pump with metallic components which was partially buried in the soil. The inspector did not observe cathodic protection for the metallic components of either of

the pump systems of either tank, which have their own pump and associated piping, in violation of 40 C.F.R. § 280.20(b).

138.    At the October 2009 inspection, the EPA inspector also observed that the overfill prevention device was not operational and that the audible alarm did not sound when tested, in violation of 40 C.F.R. § 280.20(c)(1)(ii).

139.    During the same inspection, the EPA inspector observed that an automatic tank gauge (ATG) was used to conduct release detection for tanks using continual statistical leak detection. However, no monthly records of the ATG readings were provided, in violation of 40 C.F.R. § 280.34. The EPA inspector also requested records of monthly release detection for the piping or annual line tightness tests (which is an alternative method of release detection for the piping pursuant to 40 C.F.R. § 280.41(b)), and annual ALLD tests, but the facility was unable to provide any evidence that these tests had been performed, as required by 40 C.F.R. §§ 280.41(b) and 280.44(a).

140.    EPA inspected this facility for a second time on September 26, 2011.

141.    During this inspection, EPA observed that the facility had just installed new UST systems and the new UST systems appeared to be in compliance.

142.    During EPA's most recent inspection of this facility, on January 31, 2013, the inspector observed an additional violation. Specifically, the facility had failed to conduct a timely ALLD, in violation of 40 C.F.R. § 280.44(a).

143.    The on-site representative, Karnail Singh, indicated that he was unaware of the ALLD test requirements. The facility did, however, ultimately perform the test on February 25, 2013.

24

4305 Austin Boulevard, Island Park, New York

144.     The facility at 4305 Austin Boulevard, Island Park, New York is an automobile fueling station.

145.     As of January 31, 2013, the facility has three 6,000-gallon USTs and a 2,000-gallon UST, all of which are FRP and were installed in 1984, and are therefore each an "existing tank system" as defined by 40 C.F.R § 280.12.  All three USTs store petroleum, a regulated substance.

146.     Since 2003, there has been at least one petroleum release from the USTs at this facility.

147.     During EPA's initial inspection of this facility, on October 21, 2009, EPA observed several violations.

148.     Specifically, the EPA inspector determined that there was no valid method of release detection for the USTs at the facility.  The on-site representative told the inspector that the facility relied on groundwater monitoring for release detection.  Upon information and belief, the water table at this facility is more than twenty feet below the ground surface.  Accordingly, pursuant to 40 C.F.R. § 280.43(g), groundwater monitoring is not a permissible method of release detection.  Moreover, because this facility has a history of groundwater contamination from a previous spill, groundwater monitoring is not an effective method of detecting future releases.  In addition, groundwater wells must be "clearly marked" in accordance with the requirements of 40 C.F.R. § 280.43(f).

149.     To date, despite numerous requests, EPA has been provided with no records that demonstrate that these wells met the requirements of 40 C.F.R. § 280.43(f). The groundwater

25

monitoring could not be verified because records were not made available to the inspector and the wells were not clearly marked as required by 40 C.F.R. 280.43(f)(8).

150.     During the same inspection, EPA observed that there was metallic piping between the two manifolded tanks.  Because of the metallic components of the piping, pursuant to 40 C.F.R. § 280.21(b)(2), the system was required to be upgraded with cathodic protection to prevent corrosion.  Pursuant to 40 C.F.R. § 280.31, the cathodic  protection system is required to be tested every three years and the facility must maintain cathodic protection testing records from at least the last two tests.  The EPA inspector requested all of the required cathodic protection testing records for the piping, but the facility provided only one cathodic protection test, from October 2009, and no prior testing.

151.     EPA inspected this facility for a second time on September 26, 2011.

152.     At the September 2011 inspection, the on-site representative did not provide any records that release detection monitoring was performed for the USTs or the piping, as required by 40 C.F.R. § 280.40.

153.     During the September 2011 inspection, the EPA inspector requested the records demonstrating performance of monthly release detection for the tanks and piping required to be maintained pursuant to 40 C.F.R. § 280.34 and 280.45, but the facility failed to provide any such records.

154.     During the same inspection, the EPA inspector also requested records of an annual line tightness test, which is an alternative method of release detection for piping pursuant to 40 C.F.R. § 280.44(b).  Such records were not produced.

155.     Also during the September 2011 inspection, the EPA inspector requested records

of annual ALLD tests for the three pressurized USTs that are required by 40 C.F.R. § 280.41(b), but the facility failed to provide any such records.

156.    During EPA's most recent inspection of this facility, on January 31, 2013, continuing violations were observed.

157.    Specifically, this facility continued to be unable to demonstrate performance of any valid method of release detection for its four tanks.

158.    The on-site representative also advised that he performs ten-day inventory reconciliation.  Pursuant to 40 C.F.R. § 280.41(a), this is not a valid method of release detection for tanks since these tanks are more than 10 years old.  Notwithstanding, the EPA inspector observed that many of the inventory calculations were incorrect or used the wrong values.

159.    The facility also continued to demonstrate failure to perform a valid method of release detection for the piping, as required by 40 C.F.R. § 280.44.  With respect to the electronic release detection for the piping that the EPA inspector had observed during the 2009 inspection, the facility's representative advised that the piping continued to be monitored for releases by electronic probes.  Such probes are commonly used when the operator selects monthly interstitial monitoring for release detection under 40 CFR 280.43(g) and 280.44(c).  However, the circuit box to which the probes were attached was damaged, allegedly after Hurricane Sandy in October 2012, and was not operational during the 2013 inspection, indicating that release detection still was not being performed for the piping.

160.    The EPA inspector also requested records of monthly release detection and/or annual line tightness testing for the piping, as well as ALLD tests but the facility failed to provide any such records.

161.     The EPA inspector observed that there was still a metal pipe located between the two manifolded tanks.  The inspector requested records of cathodic protection testing for the metal pipe.  Because the UST system had been previously tested in October 2009, a new test was required by 40 C.F.R. § 280.31(b) to be performed by October 2012, but the facility failed to provide any record of such testing.

162.     On June 18, 2013, the EPA received a purported response to one of its Information Request Letters ("IRL") from "Boss Auto," another entity linked to the Yetims.  The purported response provided in part a contractor's claim that the "siphon line" – the pipe connecting the two manifolded gasoline tanks – at the 4305 Austin Boulevard facility was double walled and that the outer "containment pipe" provided corrosion protection for the inner "galvanized steel line."  However, as determined by the EPA inspector in both 2011 and 2013, this outer pipe is also metallic and thus is part of the UST system and requires corrosion protection as well.  Further, it was determined in 2009 that this pipe was protected by a sacrificial anode cathodic protection system, but had not been tested in a timely manner.

EPA's Requests for Information

163.     Pursuant to 42 USC § 6991d and 40 C.F.R. § 280.34, EPA has sent by certified mail several RCRA 9005 IRLs to defendants, which defendants have failed to answer or answered incompletely.  Additionally, EPA notified defendants of their violations of RCRA and 40 C.F.R. Part 280 requirements.

164.     On September 8, 2009, EPA sent by certified mail an IRL to defendant Nedjet Yetim for the 1278 Hempstead Turnpike facility.  EPA's September 8, 2009 IRL identified the UST violations EPA had observed during the July 8, 2009 inspection and sought information

about the owners and operators of the USTs, overfill, spill and cathodic protection for the USTs, release detection for the tanks and the underground piping, and information on any USTs that may have been closed.

165.    After several attempts at delivery to Nedjet Yetim's business addresses, Nedjet Yetim accepted the letter at his home address on December 9, 2009.

166.    Thereafter, Nedjet Yetim requested that another copy of the IRL be sent to him because he had misplaced the original.  Rather than re-send the original IRL, on December 22, 2009, EPA sent a more comprehensive IRL, which requested similar information about all four of the facilities at issue in this complaint.

167.    Delivery of the December 22, 2009 IRL was rejected several times, but a copy of a revised IRL, dated June 8, 2010, was finally accepted on June 12, 2010.

168.    On July 6, 2010, Nedjet Yetim submitted an incomplete response to the IRL.

169.    In his response, Nedjet Yetim alleged that: (a) he had transferred control and ownership of the 653 Hempstead Turnpike facility to his daughter, Rachelann Yetim, and her company, Black Realty; (b) he had leased the 1278 Hempstead Turnpike facility to two different entities and would provide more information after certain tests were performed; and (c) he had no continuing involvement with the 725 Wyandanch facility.

170.    Nedjet Yetim did not provide any of the other information requested in the IRL in his response or thereafter.

171.    On July 30, 2010, EPA sent by certified mail an IRL to Rachelann Yetim, as representative of Black Realty, and requested similar information for the 653 Hempstead Turnpike Facility to the IRL that EPA had sent to Nedjet Yetim.

172.   Rachelann Yetim provided an incomplete response to the IRL on September 7, 2010.

173.   In her response, Rachelann Yetim alleged that (a) she had leased the 653 Hempstead Turnpike facility to Nassau Gas Co. in 2010; and (b) she was the owner of the 725 Wyandanch facility.

174.   Rachelann Yetim did not provide any of the other information requested by the July 2010 IRL in her response or thereafter.

175.   A follow-up IRL was sent by certified mail to Rachelann Yetim on November 19, 2010.  This IRL again requested similar information for the 653 Hempstead Turnpike facility, and also requested similar information for the 725 Wyandanch facility.  The November 19, 2010 IRL was returned as undeliverable.

176.   EPA also sent, by certified mail, two IRLs dated November 19, 2010 and December 30, 2010, respectively, to defendant Nedjet Yetim's wife, Gulcin Yetim.  Gulcin Yetim is listed as a contact person in the New York State Petroleum Bulk Storage (PBS) database for the facility owned and, at times operated, by defendant Venus Bukey Realty, Inc. which is located at 4305 Austin Boulevard, Island Park.  The IRLs sought information on the owners and operators of the USTs at 4305 Austin Boulevard facility, as well as basic information about the USTs themselves.  Both letters were returned as undeliverable.

177.   In early 2011, an attorney contacted EPA on Rachelann Yetim's behalf regarding the July 30, 2010 IRL.  EPA then sent a copy of the November 19, 2010 IRL to the attorney.

178.   Neither Rachelann Yetim nor her attorney responded to the November 2010 IRL.

179.   By certified mail, EPA sent a Notice of Violation ("NOV") and another IRL to

30

Rachelann Yetim on August 16, 2011.

180.    The August 16, 2011 IRL requested information similar to that requested in the previous IRL.  EPA also notified Rachelann Yetim that several additional violations had been observed by the EPA inspector during an inspection on July 27, 2011 at the 653 Hempstead Turnpike facility.

181.    Rachelann Yetim provided a one-page, incomplete response to the August 16, 2011 IRL on September 19, 2011.  The response provided very limited information regarding the release detection system, the temporary closure of the USTs, and the removal of one of the USTs at the 653 Hempstead Turnpike facility.  She did not respond to most of the IRL questions, and advised that her contractor, Phoenix Environmental, would respond to the IRL in the "near future."

182.    Neither Rachelann Yetim nor her contractor or attorney provided further response to the August 16, 2011 IRL.

183.    On August 16, 2011, EPA sent by certified mail another IRL to Nedjet Yetim, as representative of the purported operator of the 1278 Hempstead Turnpike facility, Liberty Petroleum – RGV Petroleum.  At the same time, EPA also sent by certified mail, Nedjet Yetim a NOV for the 1278 Hempstead Turnpike Facility, based on additional violations that were observed by the EPA inspector during the July 27, 2011 inspection.

184.    The IRL and the NOV were both sent to the 1278 Hempstead Turnpike facility and to Nedjet Yetim's home address at 2 Patricia Lane, Patchogue, NY 11772.  On information and belief, a notice was left at both addresses indicating that the letters could be picked up at the Post Office.  When no one accepted the IRL and the NOV; they were returned to EPA as

31

undeliverable.

185.   On November 7, 2011, EPA sent, by certified mail, an IRL to Kim Qu, as representative of the operator of the facility, T-Maxx @ Petro Gas.  EPA received confirmation that the letter had been received on November 8, 2011 but EPA has not to date received a response.

186.   EPA sent another IRL, by certified mail, to Kim Qu, as representative of T-Maxx @ Petro, on December 22, 2011, but that letter was returned as undeliverable.

187.   Most recently, on February 27 and 28, 2013, EPA sent defendants, by certified mail, IRLs concerning UST systems at each of the four facilities subject to this Complaint. Specifically, for the 653 Hempstead Turnpike facility, the IRLs were addressed to Rachelann Yetim (as President of TAG Gasoline, Inc., and CEO of Black Realty, Inc.).  For the 4305 Austin Boulevard facility, the IRLs were addressed to Nedjet Yetim (as President of Venus Bukey Realty, Inc.) and Emre Ocak (as CEO of PDE Island Park, Inc.).  For the 1278 Hempstead Turnpike facility, the IRLs were addressed to Nedjet Yetim (as President of ASLI & Gizem Realty Corp.) and Gulcin Yetim (as CEO of Target Petroleum, Inc.).  For the 725 Wyandanch facility, the IRLs were addressed to Rachelann Yetim (as CEO of NGRV Realty Corp.) and Karnail Singh (as CEO of S&B Petroleum, Inc.).  The IRLs request information relating to violations EPA observed during the January 31, 2013 inspections.

188.   Defendants were provided with thirty days to respond.

189.   On March 11, 2013, defendant Rachelann Yetim advised EPA that she had received the IRL regarding the 653 Hempstead Turnpike facility, and that she would soon respond.  She contacted EPA again on May 23 and 31, 2013 claiming she had sent information

by fax, and committing to sending it again via fax and mail.

190.     On June 18, 2013 a purported response to the IRL from "Boss Auto" was received by EPA with no cover letter presumably in response to the IRLs sent in regards to the 653 Hempstead Turnpike, 1278 Hempstead Turnpike and 4305 Austin Boulevard facilities (copies of each letter were included in the package).   The purported response submitted incomplete information about corrosion protection and no other information in response to the IRLs.

191.     As of the date of this Complaint, Rachelann Yetim has not fully responded to the March 1, 2013 IRL.

192.     On March 20, 2013, Karnail Singh, on behalf of S&B, provided what appears to be a complete response to the EPA's February 28, 2013 IRL pertaining to the 725 Wyandanch facility.

193.     Defendant Nedjet Yetim has shown a consistent pattern, in connection with all four facilities subject to this Complaint, of failing to respond to EPA's RCRA 9005 IRLs.

194.     Similarly, Rachelann Yetim has failed to respond to EPA's RCRA 9005 IRLs for the 653 Hempstead Turnpike and 725 Wyandanch facilities.

195.     Defendants T-Maxx @ Petro, TAG Gasoline, Black Realty, Venus Bukey, PDE Island Park, ASLI Gizem, Target Petroleum and NGRV Realty have also failed to fully respond to EPA's RCRA 9005 IRLs seeking information for the facilities that they own or operate.

196.     With the exception of S&B (which recently addressed the violations at the 725 Wyandanch facility), defendants have failed to properly address many of the violations set forth in the Notices of Violation and this Complaint.

33

**FIRST CLAIM FOR RELIEF**

Failure to Provide Cathodic Protection for Metal Piping
(Against the 653, 1278 and 725 Defendants)

197.    Paragraphs 1 through 196 are realleged and incorporated herein by reference.

198.    Defendants BLACK REALTY, INC., 102 ELMONT REALTY CORP., NGRV
REALTY CO., INC., S&B PETROLEUM, INC., HEMPSTEAD GASOLINE STATION, INC.,
LIBERTY PETROLEUM –RGV PETROLEUM, INC., ASLI & GIZEM REALTY CORP.,
TAG GASOLINE, INC., TARGET PETROLEUM, INC., GIZEM REALTY CORP., ELMONT
GASOLINE CO. INC., NEDJET YETIM and RACHELANN YETIM were required to provide
cathodic protection for the metal piping in the UST systems that they owned and/or operated, in
compliance with 40 C.F.R. § 280.20(b)(2) and § 280.21(c).

199.    EPA inspections and EPA's review of records have revealed that defendants
BLACK REALTY, INC., 102 ELMONT REALTY CORP., NGRV REALTY CO., INC., S&B
PETROLEUM, INC., HEMPSTEAD GASOLINE STATION, INC., LIBERTY PETROLEUM -
RGV PETROLEUM, INC., ASLI & GIZEM REALTY CORP., TAG GASOLINE, INC.,
TARGET PETROLEUM, INC., GIZEM REALTY CORP., ELMONT GASOLINE CO. INC.,
NEDJET YETIM and RACHELANN YETIM failed to comply with 40 C.F.R. §§ 280.20 and/or
280.21 for the UST systems that they owned and/or operated at the following facilities: 653
Hempstead Turnpike, 1278 Hempstead Turnpike and 725 Wyandanch.

200.    Pursuant to Sections 9006(a) and (d) of RCRA, 42 U.S.C. § 6991e(a) and (d),
defendants BLACK REALTY, INC., 102 ELMONT REALTY CORP., NGRV REALTY CO.,
INC., S&B PETROLEUM, INC., HEMPSTEAD GASOLINE STATION, INC., LIBERTY
PETROLEUM - RGV PETROLEUM, INC., ASLI & GIZEM REALTY CORP., TAG

34

GASOLINE, INC., TARGET PETROLEUM, INC., GIZEM REALTY CORP., ELMONT GASOLINE CO. INC., NEDJET YETIM and RACHELANN YETIM are subject to injunctive relief and are liable for civil penalties based upon the first claim for relief.

## SECOND CLAIM FOR RELIEF

### Failure to Provide Release Detection for USTs
(Against the 653, 1278 and 4305 Defendants)

201.   Paragraphs 1 through 196 are realleged and incorporated herein by reference.

202.   Pursuant to 40 C.F.R. § 280.41(a), defendants BLACK REALTY, INC., FAST GASOLINE STATION, INC., VENUS BUKEY REALTY, INC., HEMPSTEAD GASOLINE STATION, INC., LIBERTY PETROLEUM - RGV PETROLEUM, INC., ASLI & GIZEM REALTY CORP., T-MAXX @ PETRO, INC., TAG GASOLINE, INC., PDE ISLAND PARK, INC., TARGET PETROLEUM, INC., ELMONT GASOLINE CO. INC., 102 ELMONT REALTY CORP., NEDJET YETIM and RACHELANN YETIM were required to provide adequate release detection method, or combination of methods, that can detect a release from an UST that routinely contains product.

203.   EPA inspections and EPA's review of records have revealed that defendants BLACK REALTY, INC., FAST GASOLINE STATION, INC., VENUS BUKEY REALTY, INC., HEMPSTEAD GASOLINE STATION, INC., LIBERTY PETROLEUM - RGV PETROLEUM, INC., ASLI & GIZEM REALTY CORP., T-MAXX @ PETRO, INC., TAG GASOLINE, INC., PDE ISLAND PARK, INC., TARGET PETROLEUM, INC., ELMONT GASOLINE CO. INC., 102 ELMONT REALTY CORP., NEDJET YETIM and RACHELANN YETIM failed to comply with the requirements of 40 C.F.R. § 280.40 and § 280.41(a) that they provide adequate release detection method, or combination of methods that can detect a release

35

from the USTs that they owned and/or operated, and which routinely contain product, at the following facilities: 653 Hempstead Turnpike, 1278 Hempstead Turnpike and 4305 Austin Boulevard.

204.   Pursuant to Sections 9006(a) and (d) of RCRA, 42 U.S.C. § 6991e(a) and (d), defendants BLACK REALTY, INC., FAST GASOLINE STATION, INC., VENUS BUKEY REALTY, INC., HEMPSTEAD GASOLINE STATION, INC., LIBERTY PETROLEUM - RGV PETROLEUM, INC., ASLI & GIZEM REALTY CORP., T-MAXX @ PETRO, INC., TAG GASOLINE, INC., PDE ISLAND PARK, INC., TARGET PETROLEUM, INC., ELMONT GASOLINE CO. INC., 102 ELMONT REALTY CORP., NEDJET YETIM and RACHELANN YETIM are subject to injunctive relief and are liable for civil penalties based upon the second claim for relief.

### THIRD CLAIM FOR RELIEF

Failure to Provide Release Detection for Pressurized Piping System
(Against the 653, 725 and 4305 Defendants)

205.   Paragraphs 1 through 196 are realleged and incorporated herein by reference.

206.   Pursuant to 40 C.F.R. § 280.41(b)(1), defendants BLACK REALTY, INC., FAST GASOLINE STATION, INC., NGRV REALTY CO., INC., TAG GASOLINE, INC., S&B PETROLEUM, INC., VENUS BUKEY REALTY, INC., HEMPSTEAD GASOLINE STATION, INC., T-MAXX @ PETRO, INC., PDE ISLAND PARK, INC., GIZEM REALTY CORP., ELMONT GASOLINE CO. INC., 102 ELMONT REALTY CORP., NEDJET YETIM and RACHELANN YETIM are required to provide annual line tightness tests or provide monthly monitoring of pressurized piping of the UST systems that they own and/or operate.

207.   EPA inspections and EPA's review of records have revealed that defendants

36

BLACK REALTY, INC., FAST GASOLINE STATION, INC., TAG GASOLINE, INC., NGRV REALTY CO., INC., S&B PETROLEUM, INC., VENUS BUKEY REALTY, INC., HEMPSTEAD GASOLINE STATION, INC., T-MAXX @ PETRO, INC., PDE ISLAND PARK, INC., GIZEM REALTY CORP., ELMONT GASOLINE CO. INC., 102 ELMONT REALTY CORP., NEDJET YETIM and RACHELANN YETIM failed to comply with 40 C.F.R. § 280.41(b)(1) by providing annual line tightness tests or monthly monitoring of pressurized piping of the UST systems that they own and/or operate at the following facilities: 653 Hempstead Turnpike, 725 Wyandanch and 4305 Austin Boulevard.

208.    Pursuant to Sections 9006(a) and (d) of RCRA, 42 U.S.C. §§ 6991e(a) and (d), defendants BLACK REALTY, INC., FAST GASOLINE STATION, INC., TAG GASOLINE, INC., NGRV REALTY CO., INC., S&B PETROLEUM, INC., VENUS BUKEY REALTY, INC., HEMPSTEAD GASOLINE STATION, INC., T-MAXX @ PETRO , INC., PDE ISLAND PARK, INC., GIZEM REALTY CORP., ELMONT GASOLINE CO. INC., 102 ELMONT REALTY CORP., NEDJET YETIM and RACHELANN YETIM are subject to injunctive relief and are liable for civil penalties based on the third claim for relief.

### FOURTH CLAIM FOR RELIEF

Failure to Annually Test Automatic Line Leak Detectors  for Underground Piping
(Against the 653, 725 and 4305 Defendants)

209.    Paragraphs 1 through 196 are realleged and incorporated herein by reference.

210.    Pursuant to 40 C.F.R. §§ 280.34(b), 280.34(c), 280.44(a) and 280.45, defendants BLACK REALTY, INC., FAST GASOLINE STATION, INC., TAG GASOLINE, INC., NGRV REALTY CO., INC., S&B PETROLEUM, INC., VENUS BUKEY REALTY, INC., HEMPSTEAD GASOLINE STATION, INC., T-MAXX @ PETRO, INC., PDE ISLAND

37

PARK, INC., GIZEM REALTY CORP., ELMONT GASOLINE CO. INC., 102 ELMONT REALTY CORP., NEDJET YETIM and RACHELANN YETIM are required to perform testing of ALLD operation for underground piping and to maintain and provide records of such testing.

211.    EPA inspections and EPA's review of records have revealed that defendants BLACK REALTY, INC., FAST GASOLINE STATION, INC., TAG GASOLINE, INC., NGRV REALTY CO., INC., S&B PETROLEUM, INC., VENUS BUKEY REALTY, INC., HEMPSTEAD GASOLINE STATION, INC., T-MAXX @ PETRO, INC., PDE ISLAND PARK, INC., GIZEM REALTY CORP., ELMONT GASOLINE CO. INC., 102 ELMONT REALTY CORP., NEDJET YETIM and RACHELANN YETIM failed to comply with 40 C.F.R §§ 280.44(a) and 280.45 because they did not perform annual tests of ALLD operation for underground piping on UST systems that they owned and/or operated and §§ 280.34(b) and 280.34(c) because they did not maintain and provide to EPA records of such testing, at the following facilities: 653 Hempstead Turnpike, 725 Wyandanch and 4305 Austin Boulevard.

212.    Pursuant to Sections 9006(a) and (d) of RCRA, 42 U.S.C. §§ 6991e(a) and (d), defendants BLACK REALTY, INC., FAST GASOLINE STATION, INC., TAG GASOLINE, INC., NGRV REALTY CO., INC., S&B PETROLEUM, INC., VENUS BUKEY REALTY, INC., HEMPSTEAD GASOLINE STATION, INC., T-MAXX @ PETRO, INC., PDE ISLAND PARK, INC., GIZEM REALTY CORP., ELMONT GASOLINE CO. INC., 102 ELMONT REALTY CORP., NEDJET YETIM and RACHELANN YETIM are subject to injunctive relief and are liable for civil penalties based on the fourth claim for relief.

## FIFTH CLAIM FOR RELIEF

Failure to Properly Perform Testing of Cathodic Protection System
(Against the 4305 Defendants)

213.    Paragraphs 1 through 196 are realleged and incorporated herein by reference.

214.    Pursuant to 40 C.F.R. §§ 280.31(b)(1), defendants FAST GASOLINE STATION,
INC., VENUS BUKEY REALTY, INC., T-MAXX @ PETRO, INC. and PDE ISLAND PARK,
INC. are required to test cathodic protection systems on UST systems that they own and/or
operate within six months of installation and at least every three years thereafter to ensure that
the system is properly providing cathodic protection to prevent corrosion.

215.    EPA inspections and EPA's review of records have revealed that defendants
FAST GASOLINE STATION, INC., VENUS BUKEY REALTY, INC., T-MAXX @ PETRO,
INC. and PDE ISLAND PARK, INC. failed to comply with the testing requirements of 40
C.F.R. § 280.31(b)(1) for cathodic protection systems on UST systems that they owned and/or
operated at the facility at 4305 Austin Boulevard.

216.    Pursuant to Sections 9006(a) and (d) of RCRA, 42 U.S.C. §§ 6991e(a) and (d),
defendants FAST GASOLINE STATION, INC., VENUS BUKEY REALTY, INC., T-MAXX
@ PETRO, INC. and PDE ISLAND PARK, INC. are subject to injunctive relief and are liable
for civil penalties based on the fifth claim for relief.

## SIXTH CLAIM FOR RELIEF

Failure to Maintain Records of Release Detection
(Against the 725 Defendants)

217.    Paragraphs 1 through 196 are realleged and incorporated herein by reference.

218.    Pursuant to 40 C.F.R. § 280.34 and § 280.45, defendants NEDJET YETIM,

RACHELANN YETIM, NGRV REALTY CO., INC., VENUS BUKEY REALTY, INC., S&B PETROLEUM, INC. and GIZEM REALTY CORP. were required to maintain and provide records demonstrating compliance with release detection requirements for the new and existing UST systems that they owned and/or operated, and to submit that information to EPA upon request.

219.    EPA inspections and EPA's review of records have revealed that defendants NEDJET YETIM, RACHELANN YETIM, NGRV REALTY CO., INC., VENUS BUKEY REALTY, INC., S&B PETROLEUM, INC. and GIZEM REALTY CORP. failed to maintain and provide records of release detection for the UST systems that they owned and/or operated at the 725 Wyandanch facility, in violation of 40 C.F.R. §§ 280.34 and 280.45.

220.    Pursuant to Sections 9006(a) and (d) of RCRA, 42 U.S.C. § 6991e(a) and (d), defendants NEDJET YETIM, RACHELANN YETIM, NGRV REALTY CO., INC., VENUS BUKEY REALTY, INC., S&B PETROLEUM, INC. and GIZEM REALTY CORP. are subject to injunctive relief and are liable for civil penalties based upon the sixth claim for relief.

## SEVENTH CLAIM FOR RELIEF

Failure to Comply With Temporary Closure Requirements for UST Systems
(Against the 653 Defendants)

221.    Paragraphs 1 through 196 are realleged and incorporated herein by reference.

222.    Pursuant to 40 C.F.R. § 280.70(b), when an UST system has been out of service for three months or more, defendants BLACK REALTY, INC., TAG GASOLINE, INC., HEMPSTEAD GASOLINE STATION, INC., ELMONT GASOLINE CO. INC., 102 ELMONT REALTY CORP., NEDJET YETIM, and RACHELANN YETIM are required to temporarily close the out-of-service UST system by (1) leaving vent lines open and functioning and (2)

capping and securing all other lines, pumps, manways, and ancillary equipment.

223.    EPA inspections and EPA's review of records have revealed that defendants BLACK REALTY, INC., TAG GASOLINE, INC., HEMPSTEAD GASOLINE STATION, INC., ELMONT GASOLINE CO. INC., 102 ELMONT REALTY CORP., NEDJET YETIM, and RACHELANN YETIM  failed to comply with temporary closure requirements of 40 C.F.R. § 280.70(b) for the USTs that they owned and/or operated at the following facility that were out of service for three months or more: 653 Hempstead Turnpike.

224.    Pursuant to Sections 9006(a) and (d) of RCRA, 42 U.S.C. § 6991e(a) and (d), defendants BLACK REALTY, INC., TAG GASOLINE, INC., HEMPSTEAD GASOLINE STATION, INC., ELMONT GASOLINE CO. INC., 102 ELMONT REALTY CORP., NEDJET YETIM, and RACHELANN YETIM are subject to injunctive relief and are liable for civil penalties based upon the seventh claim for relief.

## EIGHTH CLAIM FOR RELIEF

### Failure to Install Adequate Overfill Prevention in New and Existing USTs
(Against the 725 and 1278 Defendants)

225.    Paragraphs 1 through 196 are realleged and incorporated herein by reference.

226.    Pursuant to 40 C.F.R. § 280.20(c)(1)(ii) and 40 C.F.R. § 280.21(d), defendants NGRV REALTY CO., INC., S&B PETROLEUM, INC., GIZEM REALTY CORP., NEDJET YETIM, RACHELANN YETIM, LIBERTY PETROLEUM - RGV PETROLEUM, INC., ASLI & GIZEM REALTY CORP., and TARGET PETROLEUM, INC., are required to install adequate overfill prevention for new USTs and provide adequate overfill prevention for existing USTs.

227.    EPA inspections and EPA's review of records have revealed that defendants

41

NGRV REALTY CO., INC., S&B PETROLEUM, INC., GIZEM REALTY CORP., NEDJET YETIM and RACHELANN YETIM failed to comply with the installation requirements of 40 C.F.R. § 280.20(c)(1)(ii) for the two new USTs that they owned and/or operated at the 725 Wyandanch facility, and that defendants LIBERTY PETROLEUM - RGV PETROLEUM, INC., ASLI & GIZEM REALTY CORP., TARGET PETROLEUM, INC., and NEDJET YETIM failed to comply with the overfill prevention requirements of 40 C.F.R. § 280.21(d) for the existing USTs that they owned and/or operated at the 1278 Hempstead Turnpike facility.

228.   Pursuant to Sections 9006(a) and (d) of RCRA, 42 U.S.C. § 6991e(a) and (d), defendants NGRV REALTY CO., INC., S&B PETROLEUM, INC., GIZEM REALTY CORP., NEDJET YETIM, RACHELANN YETIM, LIBERTY PETROLEUM - RGV PETROLEUM, INC., ASLI & GIZEM REALTY CORP., and TARGET PETROLEUM, INC., are subject to injunctive relief and are liable for civil penalties based upon the eighth claim for relief.

## NINTH CLAIM FOR RELIEF

### Failure to Respond to EPA Requests for Information Regarding UST Systems
(Against Multiple Defendants)

229.   Paragraphs 1 through 196 are realleged and incorporated herein by reference.

230.   Pursuant to Section 9005 of Subtitle I of RCRA, 42 U.S.C. § 6991(d), and 40 C.F.R. § 280.34, EPA has sent Requests for Information letters to RACHELANN YETIM (as President of TAG GASOLINE, INC., CEO of BLACK REALTY, INC. and CEO of NGRV REALTY CORP.), NEDJET YETIM (as President of VENUS BUKEY REALTY, INC. and President of ASLI & GIZEM REALTY CORP.), and representatives of PDE ISLAND PARK, INC., TARGET PETROLEUM, INC., and T-MAXX @ PETRO, INC.

231.   Defendants NEDJET YETIM, RACHELANN YETIM, T-MAXX @ PETRO

GAS, INC., TAG GASOLINE, INC., BLACK REALTY, INC., VENUS BUKEY REALTY, INC., PDE ISLAND PARK, INC., ASLI & GIZEM REALTY, INC., TARGET PETROLEUM, INC. and NGRV REALTY CO., INC. failed to respond to these requests for information regarding UST systems that they have owned and/or operated, as required by Section 9005 of RCRA, 42 U.S.C. § 6991d, and 40 C.F.R. § 280.34.

232.   Pursuant to Sections 9006(a) and (d) of RCRA, 42 U.S.C. § 6991e(a) and (d), defendants NEDJET YETIM, RACHELANN YETIM, T-MAXX @ PETRO GAS, INC., TAG GASOLINE, INC., BLACK REALTY, INC., VENUS BUKEY REALTY, INC., PDE ISLAND PARK, INC., ASLI & GIZEM REALTY, INC., TARGET PETROLEUM, INC. and NGRV REALTY CO., INC., are subject to injunctive relief and are liable for civil penalties based upon the tenth claim for relief.

## PRAYER FOR RELIEF

WHEREFORE, plaintiff, the United States of America respectfully prays that this Court grant the following relief:

Enjoin the defendants to comply with all applicable requirements for Subtitle I of RCRA, 42 U.S.C. § 6991 et seq., and its implementing regulations;

With respect to each day of each violation of RCRA and its implementing regulations at each facility set forth under each claim for relief set forth in this Complaint, order defendants to pay a civil penalty in the amount of $11,000 per tank for each day of violation from January 30, 1997 through January 12, 2009, and $16,000 per tank for each day of violation after January 12, 2009; and

Award plaintiff the costs of this action, and such further relief as this Court may deem

appropriate.

ELLEN M. MAHAN
Deputy Section Chief
Environmental Enforcement Section
Environment and Natural Resources Division
U.S. Department of Justice

Dated: Central Islip, N.Y.
      February 7, 2014

LORETTA E. LYNCH
United States Attorney
Eastern District of New York
Attorney for Plaintiff
610 Federal Plaza
Central Islip, New York 11722

By:                                                                

KENNETH M. ABELL
Assistant U.S. Attorney
(631) 715-7833

Of Counsel:
KAREN L. TAYLOR
Assistant Regional Counsel
U.S. Environmental Protection
Agency, Region 2
290 Broadway
New York, NY 10007

44