UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

───────────────────

№ 14-CV-847 (JFB) (SIL)
───────────────────

UNITED STATES OF AMERICA,

Plaintiff,

VERSUS

NEDJET YETIM, ET AL.,

Defendants.
───────────────────

**MEMORANDUM AND ORDER**
April 20, 2017
───────────────────

JOSEPH F. BIANCO, District Judge:

Plaintiff the United States of America (the "government") filed a complaint on February 7, 2014 alleging violations of the Resource Conservation and Recovery Act ("RCRA"), 42 U.S.C. § 6991e, and its implementing regulations by two individual defendants—Nedjet Yetim ("Yetim") and his daughter Rachelann Yetim—and several corporate entities. (ECF No. 1.) The government has now moved for partial summary judgment pursuant to Federal Rule of Civil Procedure 56 against Yetim and his companies ASLI & Gizem Realty Corp. ("ASLI") and Target Petroleum, Inc. ("Target") (collectively, "defendants").[1]

Specifically, the government seeks an award of monetary damages and injunctive relief against defendants in connection with RCRA violations concerning underground petroleum storage tanks at a gasoline station located at 1278 Hempstead Turnpike, Elmont, New York (the "1278 Facility"). In response, defendants do not dispute the violations alleged by the government; instead, they argue that (1) the $850,300 penalty sought by the government is excessive and unduly punitive, and (2) an injunction requiring defendant Yetim to comply with RCRA and its regulations is unnecessary because he is no longer in the business of operating gasoline stations.

---

[1] On October 3, 2016, the Court so-ordered a consent judgment against Rachelann Yetim and the remaining corporate defendants. (ECF No. 66.)

For the reasons set forth below, the government's motion for partial summary judgment is granted as to liability, and the Court enjoins defendants from future violations of RCRA and the regulations promulgated thereunder. However, the Court believes an evidentiary hearing is necessary to determine an appropriate monetary penalty against defendants.

I. BACKGROUND

A. Facts

The following facts are taken from the parties' Rule 56.1 statements ("Govt.'s 56.1," ECF No. 54; "Defs.' 56.1," ECF No. 56), as well as the parties' affidavits and exhibits. Unless otherwise noted, the facts are either undisputed or uncontroverted by admissible evidence. Because defendants do not dispute that they committed the RCRA violations at issue, the Court will summarize only those facts that pertain to the relief sought by the government. Upon consideration of the motion for partial summary judgment, the Court will construe the facts in the light most favorable to defendants as the nonmoving party, and it will resolve all factual ambiguities in their favor. *See Capobianco v. New York*, 422 F.3d 47, 50 n.1 (2d Cir. 2001).

1. Yetim's History

Defendant Yetim has been involved in some capacity with approximately 150 gasoline stations and has owned three or four stations at various points in time, but he has never had any training relating to underground petroleum storage tanks ("USTs") or their relevant regulations. (Govt.'s 56.1 ¶ 4.) Over the years, Yetim has set up approximately twenty different corporations to own or operate the gasoline stations with which he has been involved, including defendants ASLI and Target. (*Id*. ¶¶ 5-7.)

Yetim has been arrested several times in connection with his ownership or operation of gasoline stations on Long Island, and he spent three years in prison on a New York state grand larceny charge relating to his gasoline station business. (*Id*. ¶ 2.) He was also convicted of endangering the public welfare due to a UST that was leaking petroleum into the ground at a gasoline station that he owned. (*Id*. ¶ 3.) Specifically, in or around October 2009, the Nassau County District Attorney's Office charged Yetim with Endangering Public Health, Safety or the Environment in the Third Degree and Knowingly Violating a Final Administrative Order, both felonies, in connection with his ownership and operation of a gasoline station at 653 Hempstead Turnpike. (*Id*. ¶ 24.) Yetim and one of his corporate entities ultimately pled guilty in that matter. (*Id*. ¶ 28.)

2. The 1278 Facility

For many years, Yetim—individually and through his various corporate entities—was the owner and operator of UST systems at the 1278 Facility until the end of 2013. (*Id*. ¶ 8.) The 1278 Facility is a gasoline station and maintenance center located within the boundaries of a federally-designated Sole Source Aquifer, which supplies at least fifty percent of the drinking water consumed within the aquifer's boundaries. (*Id*. ¶ 16.) From at least 1999 to 2013, Yetim managed, directed, or conducted decisions about environmental compliance at the 1278 Facility, and during that time, he was the primary point of contact for the New York State Department of Environmental Conservation ("NYSDEC") and the United States Environmental Protection Agency (the

2

"EPA") regarding day-to-day operations at the 1278 Facility. (*Id.* ¶¶ 17-18.)

Prior to the summer of 2011, the 1278 Facility had three active, 4,000-gallon USTs. (*Id.* ¶ 23.) Since 1999, there have been at least eight reported petroleum releases from the USTs at the 1278 Facility, one of which resulted in NYSDEC installing a groundwater remediation system. (*Id.* ¶ 19.) With respect to one of those releases, NYSDEC informed Yetim that there had been a leak from a UST at the 1278 Facility and that he was required to clean up the property. (*Id.* ¶ 20.) He responded that he did not have the money to do so, and as a result, NYSDEC entered the property and cleaned the spill. (*Id.* ¶ 21.)

From at least 2009 until 2013, EPA personnel repeatedly informed Yetim about regulatory violations concerning USTs at the 1278 Facility, but he failed to remedy them. (*Id.* ¶ 30.) Specifically, the EPA conducted three separate inspections of the 1278 Facility on July 8, 2009; July 27, 2011; and January 31, 2013. (*Id.* ¶ 31.) During the initial inspection in July 2009, EPA Environmental Engineer Paul Sacker ("Sacker") observed corrosion on fiberglass-reinforced plastic piping connected to some metallic components, indicating that the metallic piping components had not been upgraded with adequate cathodic protection as required by regulation. (*Id.* ¶ 32.) Sacker also noted that the regular fill pipe in one of the USTs had no overfill protection and that the 1278 Facility did not employ adequate methods to detect the release of petroleum from its USTs, safeguards that were also legally-mandated. (*Id.* ¶¶ 33-35.) Sacker then spoke with Yetim regarding those regulatory infractions, but Yetim was hostile and refused to answer any of his questions. (*Id.* ¶ 36.)

On September 8, 2009, the EPA sent Yetim an Information Request Letter ("IRL") identifying the UST regulatory violations observed during the July 8, 2009 inspection and seeking information about the owners and operators of the USTs; the overfill, spill, and cathodic protections for the USTs; release detection for the USTs and the underground piping; and information on any USTs that may have been closed. (*Id.* ¶ 37.) After multiple attempts at delivery to Yetim's business addresses, Yetim eventually accepted the IRL at his home address on December 9, 2009, but he thereafter told the EPA that he had lost the IRL and requested another copy. (*Id.* ¶¶ 38-39.) On December 22, 2009, the EPA sent a more comprehensive IRL, which requested similar information about the 1278 Facility, as well as three other facilities that Yetim was believed to own and/or operate. (*Id.* ¶ 39.) Nevertheless, Yetim rejected delivery of the December 22, 2009 IRL several times, ultimately accepting a copy of a further revised IRL on or around June 8, 2010. (*Id.* ¶ 40.) On July 6, 2010, Yetim submitted an incomplete response to the IRL stating that he had leased the 1278 Facility to two different entities and would provide more information after certain tests were performed. (*Id.* ¶¶ 41-42.) However, he never provided any of the requested information to the EPA. (*Id.* ¶ 43.)

The EPA, through Sacker, inspected the 1278 Facility for a second time on July 27, 2011. (*Id.* ¶ 44.) During the re-inspection, Sacker observed that metallic piping connected to one of the dispensers did not have cathodic protection, and that there was also no evidence of release detection for the USTs. (*Id.* ¶¶ 45-46.) On August 16, 2011, the EPA sent another IRL to Yetim, as well

3

as a Notice of Violation for the 1278 Facility based on the additional regulatory infractions that Sacker had observed during the July 27, 2011 inspection. (*Id*. ¶ 47.) Both documents were later returned to the EPA as undeliverable. (*Id*. ¶ 48.)

In December 2011, there was a significant petroleum release from one of the USTs at the 1278 Facility, reported to NYSDEC as Spill Number 1110974. (*Id*. ¶ 49.) However, Yetim ignored several requests to address the release by, for example, repairing the UST or taking it out of service. (*Id*.) On or about April 17, 2012, NYSDEC issued a delivery prohibition—a formal notice placed on each UST which prohibited delivery of petroleum to the 1278 Facility—when it discovered that Yetim continued to operate the USTs without addressing the December 2011 petroleum release by emptying and repairing the tanks. (*Id.* ¶ 50.) Defendants subsequently closed one of the USTs at the 1278 Facility under the oversight of NYSDEC. (*Id.* ¶ 51.)

The EPA inspected the 1278 Facility for a third time on January 31, 2013, and Sacker again observed a lack of proper cathodic protection. (*Id.* ¶¶ 52-53.) On February 27 and 28, 2013, the EPA sent IRLs concerning the UST systems at the 1278 Facility to Yetim requesting information relating to regulatory violations the EPA observed during the January 31, 2013 inspection. (*Id.* ¶ 54.) On June 18, 2013, after the reply deadline, the EPA received a purported response to the IRLs from a "Boss Auto." (*Id.* ¶ 55.) The response attached the February 2013 IRLs, confirming that Yetim had received them, and submitted incomplete information about corrosion protection and none of the other requested information. (*Id*.) Yetim remained in violation of UST requirements at the 1278 Facility until December 16, 2013, when he transferred his ownership of the USTs to another, unaffiliated corporate entity. (*Id.* ¶ 56.)

During his deposition, Yetim admitted that throughout the entire time he owned and operated the 1278 Facility, from 1999 to 2013, he did not know what type of leak detection, cathodic protection, or overfill protection systems were in place on the USTs at that station. (*Id.* ¶¶ 65-67.) Yetim also testified that he is no longer in the gasoline business and has no intention of returning to it. (*Id.* ¶ 68.)

B. Procedural History

The government commenced this action on February 7, 2014 (ECF No. 1) and filed its motion for partial summary judgment against defendants on March 2, 2016 (ECF No. 51). Defendants filed their opposition on April 29, 2016 (ECF No. 57), and the government filed its reply on May 10, 2016 (ECF No. 59). The Court held oral argument on June 1, 2016 and afforded defendants an opportunity to submit a supplemental letter providing information about petroleum leaks at the 1278 Facility. (ECF No. 60.) Defendants filed their letter on June 9, 2016 (ECF No. 61), and the government responded on June 16, 2016 (ECF No. 62). The Court has carefully considered the parties' submissions.

II. STANDARD OF REVIEW

The standard for summary judgment is well-settled. Pursuant to Federal Rule of Civil Procedure 56(a), a court may grant a motion for summary judgment only if "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); *see also Gonzalez v. City of Schenectady*, 728 F.3d 149, 154 (2d

Cir. 2013). The moving party bears the burden of showing that it is entitled to summary judgment. *See Huminski v. Corsones*, 396 F.3d 53, 69 (2d Cir. 2005). Rule 56(c)(1) provides that a

> party asserting that a fact cannot be or is genuinely disputed must support the assertion by: (A) citing to particular parts of materials in the record, including depositions, documents, electronically stored information, affidavits or declarations, stipulations (including those made for purposes of the motion only), admissions, interrogatory answers, or other materials; or (B) showing that the materials cited do not establish the absence or presence of a genuine dispute, or that an adverse party cannot produce admissible evidence to support the fact.

Fed. R. Civ. P. 56(c)(1). The court "'is not to weigh the evidence but is instead required to view the evidence in the light most favorable to the party opposing summary judgment, to draw all reasonable inferences in favor of that party, and to eschew credibility assessments.'" *Amnesty Am. v. Town of W. Hartford*, 361 F.3d 113, 122 (2d Cir. 2004) (quoting *Weyant v. Okst*, 101 F.3d 845, 854 (2d Cir. 1996)); *see also Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986) (summary judgment is unwarranted if "the evidence is such that a reasonable jury could return a verdict for the nonmoving party").

Once the moving party has met its burden, the opposing party "'must do more than simply show that there is some metaphysical doubt as to the material facts . . . . [T]he nonmoving party must come forward with specific facts showing that there is a *genuine issue for trial*.'" *Caldarola v. Calabrese*, 298 F.3d 156, 160 (2d Cir. 2002) (alteration and emphasis in original) (quoting *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586-87 (1986)). As the Supreme Court stated in *Anderson*, "[i]f the evidence is merely colorable, or is not significantly probative, summary judgment may be granted." 477 U.S. at 249-50 (citations omitted). Indeed, "the mere existence of *some* alleged factual dispute between the parties alone will not defeat an otherwise properly supported motion for summary judgment." *Id.* at 247-48 (emphasis in original). Thus, the nonmoving party may not rest upon mere conclusory allegations or denials but must set forth "'concrete particulars'" showing that a trial is needed. *R.G. Grp., Inc. v. Horn & Hardart Co.*, 751 F.2d 69, 77 (2d Cir. 1984) (quoting *SEC v. Research Automation Corp.*, 585 F.2d 31, 33 (2d Cir. 1978)). Accordingly, it is insufficient for a party opposing summary judgment "'merely to assert a conclusion without supplying supporting arguments or facts.'" *BellSouth Telecomms., Inc. v. W.R. Grace & Co.-Conn.*, 77 F.3d 603, 615 (2d Cir. 1996) (quoting *Research Automation Corp.*, 585 F.2d at 33).

### III. DISCUSSION

In support of its motion for partial summary judgment, the government argues that (1) there are no material disputes of fact regarding (a) defendants' ownership of the 1278 Facility and (b) documented RCRA violations at the 1278 Facility; (2) the Court should assess a penalty of at least $850,300 against defendants; and (3) the Court should enjoin defendants from committing future RCRA violations.

As noted, defendants' opposition is limited to the relief sought by the government, *i.e.*, they acknowledge ownership of the 1278 Facility and that they

violated RCRA and its implementing regulations. In his brief affidavit, Yetim asserts that (1) he is "no longer operating any gasoline service stations and [has] been out of the business for years" with "no intention of returning"; (2) "the amount of the penalty . . . is punitive and unwarranted" and "serves no useful purpose other than to penalize [him] for matters previously addressed by" NYSDEC; (3) the government can only prove that the violations at issue occurred on the three dates in 2009, 2011, and 2013 when Sacker inspected the 1278 Facility; (4) the violations at issue were "technical in nature" that "never affected the environment nor caused any type of leak or contamination of the groundwater"; and (5) the penalty sought by the government improperly attempts "to impose a violation for each" of the 1278 Facility's USTs. (Defs.' Opp'n Br., ECF No. 57, at 1-4.)

For the reasons that follow, the government's motion for partial summary judgment is granted as to liability, and the Court enjoins defendants from future violations of RCRA and the regulations promulgated thereunder. However, the Court believes an evidentiary hearing is necessary to determine an appropriate monetary penalty.

A. Applicable Law

RCRA provides that "[a]ny owner or operator of an underground storage tank who fails to comply with," *inter alia*, "any requirement or standard promulgated by the [EPA] Administrator under section 6991b[2] of this title . . . shall be subject to a civil penalty not to exceed $[16,000][3] for each tank for each day of violation." 42 U.S.C. § 6991e(d)(2). In addition to setting an upper limit of any penalty imposed under this section, RCRA states that two factors "may be taken into account in determining the terms of a civil penalty under subsection (d)": (1) the "compliance history of an owner or operator"; and (2) "[a]ny other factor the [EPA] Administrator considers appropriate." *Id*. § 6991e(e).

There is scant case law applying this particular RCRA provision, and *United States v. DiPaolo*, 466 F. Supp. 2d 476 (S.D.N.Y. 2006), appears to be the sole decision assessing the reasonability of a penalty imposed Section 6991e(d)(2). There, the district court noted that "the actual amount of the fine, within the statutory framework, is left to [a] court's sound discretion," and it "considered a variety of factors, including the seriousness of the violation, [the] defendant's financial situation and any good faith effort to comply with the applicable requirements." *Id*. at 486. The court found that a *de minimis* penalty was appropriate in that case because there was no environmental damage since "neither of [the] defendant's underground storage tanks ha[d] never [sic] actually leaked and both [were] nonoperational," and the "defendant ha[d] represented to th[e] Court, and plaintiff ha[d] not shown otherwise, that he ha[d] few assets with which to satisfy a judgment and ha[d] incurred significant expense to date as a

---

[2] 42 U.S.C. § 6991b states that the EPA Administrator "shall promulgate release detection, prevention, and correction regulations applicable to all owners and operators of underground storage tanks, as may be necessary to protect human health and the environment." 42 U.S.C. § 6991b.

[3] Although this provision actually specifies that civil penalties shall not exceed $10,000 per day per tank, 42 U.S.C. § 6991e(d)(2), that cap was increased to $16,000 for violations occurring after January 12, 2009 and through December 6, 2013 based on a regulatory adjustment for inflation, *see* 40 C.F.R. § 19.4 (2015).

6

result of the EPA's investigation and prosecution of this matter." *Id*. at 486-87. The court, therefore, concluded that "a fine of $80,317,[4] combined with the cost of future compliance with applicable law, [was] sufficient to deter [the] defendant from future wrongdoing," and that "[a]dditional penalties could very well prevent [the] defendant from complying with the applicable EPA regulations as a result of the additional financial burden." *Id*. at 487. It noted that, although the government emphasized that additional penalties would have a deterrence effect, imposing a larger fine "would be fruitless or even counterproductive. In any event, plaintiff fail[ed] to provide th[e] Court with any guidance as to the appropriate amount of penalties and merely point[ed] out that, under applicable law, *up to* approximately $42,212,500 could be assessed against [the] defendant." *Id*.

Similarly, in *United States v. Ekco Housewares, Inc.*, 62 F.3d 806 (6th Cir. 1995), the Sixth Circuit held that in calculating damages pursuant to Section 3008(g) of RCRA—which penalizes, among other things, non-compliance with certain EPA administrative orders, 42 U.S.C. § 6928(g)—district courts should "take into account the seriousness of the violation and any good faith efforts to comply. Numerous other factors are relevant, including the harm caused by the violation, any economic benefit derived from noncompliance, the violator's ability to pay, the government's conduct, and the clarity of the obligation involved." *Id*. at 814. The Sixth Circuit found that the trial court had abused its discretion in imposing a $1,000 per day penalty because it failed to accord appropriate mitigating weight to the fact that the defendant had complied with its legal obligations during certain time periods, and it remanded for a new calculation. *Id*. at 815-17. However, the court affirmed that the "amount of [the] penalty can be based on the economic benefit gained through noncompliance," and that the " district court properly considered the deterrence effect not just on [the defendant,] but on the regulated community as a whole." *Id*. at 816.

Other cases likewise establish that district courts have substantial discretion in determining an appropriate monetary penalty to remedy violations of environmental laws and regulations. *See, e.g.*, *Tull v. United States*, 481 U.S. 412, 426 (1987) (observing that calculating damages for violations of the Clean Water Act, 33 U.S.C. § 1251 *et seq.*, involves "highly discretionary calculations" by trial judges "that take into account multiple factors"); *Catskill Mountains Chapter of Trout Unlimited, Inc. v. City of N.Y.*, 451 F.3d 77, 87 (2d Cir. 2006) (same); *United States v. M. Genzale Plating, Inc.*, 807 F. Supp 937, 938 (E.D.N.Y. 1992) (holding that the "determination of the appropriate civil penalty is a matter within the discretion of the trial court" in a Comprehensive Environmental Response, Compensation, and Liability Act case, 42 U.S.C. § 9604(e)(5)(A)). *Catskill Mountains* concerned the Clean Water Act (the "CWA"), and the Second Circuit noted that "[i]n calculating civil penalties under the CWA, the court may begin either with the violator's estimated economic benefit from noncompliance (known as the 'bottom-up' method) or with the statutory maximum allowable penalty (known as the 'top-down'

---

[4] The court ultimately required the defendant to pay a civil penalty of $89,681.14 after calculating interest. *Id*. at 487.

7

method)." 451 F.3d at 87. The district court may then adjust that starting figure

> after considering the six factors enumerated in section 309(d) of the CWA: (1) the seriousness of the violations; (2) the economic benefit resulting from the violation; (3) any history of violations; (4) good-faith efforts to comply with applicable requirements; (5) the economic impact of the penalty on the violator; and (6) other matters as justice may require.

*Id.* (citing 33 U.S.C. § 1319(d)). In the absence of a similar framework under RCRA, the Court believes, in its discretion, that it is appropriate to apply these factors to the instant case.

B. Analysis

Here, the Court finds that injunctive relief is warranted due to defendants' admission of liability for the RCRA violations at issue. However, based on the current record, the Court is unable to determine an appropriate monetary penalty without an evidentiary hearing. Accordingly, the Court will hold a hearing to allow the parties to submit evidence pertaining to the relevant factors discussed above.

The government requests a monetary penalty of no less than $850,300, which it "calculated by multiplying the total number of days in violation [8503] by $100 per day of violation." (Govt.'s Br., ECF No. 55, at 25-26 (brackets in original).) It argues that this amount is appropriate "due to the specific factors at issue in this case and respectfully submits that it is fair and reasonable given the serious threat defendants' violations have posed to human health and the environment and the consequent importance of deterring future violations." (*Id.* at 26 (citation omitted).) The government also contends that because RCRA authorizes a maximum fine of $16,000 per tank for each day of violation, *see* 42 U.S.C. § 6991e(d)(2); 40 C.F.R. § 19.4 (2015), the Court could require defendants to pay as much as $136,048,000. (*Id.* at 14-15.)

The Court agrees that some of the *Catskill Mountains* factors favor the government. The uncontroverted evidence shows that Yetim is a habitual offender of RCRA and that defendants did not undertake any good-faith efforts to comply with the regulations at issue, or to remedy the violations for which they have admitted liability. For instance, Yetim failed to respond to several IRLs sent by the EPA, and when he did eventually respond, the information he provided was incomplete. (*See, e.g.*, Govt.'s 56.1 ¶¶ 45-48, 55-56.) More to the point, from 2009 to 2013, defendants did not equip the USTs at the 1278 Facility with leak detection, cathodic protection, or overfill protection systems despite warnings from the EPA. (*See, e.g.*, *id.* ¶¶ 30-36, 44-47, 52-53.) During that period, a significant petroleum release from one of the USTs at the 1278 Facility occurred in December 2011. (*Id.* ¶ 49.)

However, the record does not contain any evidence of either the economic benefits that defendants accrued as a result of their regulatory infractions, or of their ability to pay the penalty sought by the government.[5] Those factors are relevant to calculating a just

---

[5] The government states that defendants "refused to provide more than fragmentary pieces of financial information in connection with the efforts to resolve this litigation . . . ." (Govt.'s Br. at 25.) Nevertheless, the Court, in its discretion, will afford defendants an opportunity to adduce such evidence at a hearing.

8

penalty. *See, e.g.*, *DiPaolo*, 466 F. Supp. 2d at 487; *M. Genzale Plating, Inc.*, 807 F. Supp. at 940 (finding, after a hearing, that defendants had "significant financial resources at their disposal"). In addition, it is not clear whether defendants' regulatory violations resulted in environmental harm during the relevant period. Although a petroleum leak did occur in December 2011, defendants asserted at oral argument that the cause was a puncture to one of the 1278 Facility's USTs by a rock, rather than a failure to comply with the RCRA rules at issue.[6] The government is correct that RCRA is a strict liability statute, but the environmental impact of defendants' infractions is a relevant consideration for the purposes of determining an appropriate penalty. *See DiPaolo*, 466 F. Supp. 2d at 486.

Accordingly, the Court, in its discretion, believes that it is necessary to hold an evidentiary hearing before imposing a monetary penalty. *See, e.g.*, *Tamarin v. Adam Caterers, Inc.*, 13 F.3d 51, 54 (2d Cir. 1993) (holding that "district judges [have] much discretion in determining when it is 'necessary and proper' to hold an inquest on damages"). At that hearing, the parties may adduce evidence that is relevant to the six *Catskill Mountains* factors discussed above. As a threshold matter, however, the Court rejects defendants' arguments that (1) the Court is limited to imposing a penalty for violations that occurred on the three inspection dates, rather than the 8,503 days that the government used in its calculation; and (2) the Court may not impose a separate penalty for each individual UST at the 1278 Facility. Defendants have not offered any authority to support their first argument, and on the contrary, the case law demonstrates that the Court may infer that defendants failed to comply with RCRA during the periods between the EPA inspections. *See DiPaolo*, 466 F. Supp. 2d at 486 (imposing a per-day penalty based on the defendant's failure to comply with EPA administrative orders for 825 days, and to respond to the EPA's information requests for 700 days); *Ekco Housewares*, 62 F.3d at 806 (per-day penalty calculated based on the defendant's failure to comply with EPA administrative orders over approximately 4,500 days). With respect to defendants' second argument, it is clear from the text of the statute that the Court must calculate an appropriate penalty based on "*each tank* for each day of violation." 42 U.S.C. § 6991e(d)(2) (emphasis added); *see also DiPaolo*, 466 F. Supp. 2d at 486 n.15 (holding that under RCRA, each day of violation is "multiplied by the amount of tanks").

In sum, the Court lacks sufficient information at this juncture to calculate an appropriate penalty for defendants' RCRA violations and will, therefore, hold an evidentiary hearing. However, because defendants have admitted liability for the regulatory infractions at issue, permanent injunctive relief is warranted.[7]

IV. CONCLUSION

For the foregoing reasons, the Court grants the government's motion for partial

---

[6] The Court afforded defendants an opportunity to submit proof of this contention after oral argument, but their letter does not contain pertinent information. (*See* ECF No. 61.) Nevertheless, the Court, in its discretion, will afford defendants an opportunity to adduce such evidence at a hearing.

[7] Yetim's assertion that he is no longer in the gasoline business is irrelevant. Given defendants' admission of liability and history of misconduct, and the possibility that Yetim could later decide to return to the gasoline business, the Court believes that an injunction is necessary to deter defendants from committing future RCRA violations. *See S.E.C. v. Contorinis*, 743 F.3d

summary judgment as to liability. Defendants Nedjet Yetim, ASLI & Gizem Realty Corp., and Target Petroleum, Inc. are hereby ordered to immediately cease any and all continuing RCRA violations and to comply with all applicable requirements of RCRA and its implementing regulations governing underground storage tanks as set forth in 40 C.F.R. Part 280. The Court will hold an evidentiary hearing on the government's request for a monetary penalty.

   SO ORDERED.

_____

   JOSEPH F. BIANCO
   United States District Judge

Dated: April 20, 2017
   Central Islip, New York

     ***

The government is represented by Kenneth M. Abell, Assistant United States Attorney, of the United States Attorney's Office for the Eastern District of New York, 271 Cadman Plaza East, 8th Floor, Brooklyn, New York 11201. Defendants Nedjet Yetim, ASLI & Gizem Realty Corp., and Target Petroleum, Inc. are represented by Darrell J. Conway of Darrell J. Conway, P.C., 179 Little East Neck Road, West Babylon, New York 11704.

---

296, 308-09 (2d Cir. 2014) (affirming that injunctive relief was warranted based on defendant's "lack of remorse" for multiple insider trading violations and "to deter future wrongdoing of a like type").